NATIONAL BINDING MACH. CO. v. LARKIN CO.

(Circuit Court of Appeals, Second Circuit. April 25, 1916.)

No. 247.

PATENTS ⬤328—INVENTION—BINDING MACHINE.
    The Brownson patent, No. 913,614, for a strip-serving apparatus for moistening and delivering gummed tape for binding packages, while covering an improvement on prior devices, does not disclose the exercise of more than mechanical skill, and is void for lack of invention.

Appeal from the District Court of the United States for the Western District of New York.

Suit in equity by the National Binding Machine Company against the Larkin Company. Decree for defendant, and complainant appeals. Affirmed.

The plaintiff is a corporation existing under the laws of the state of Maine and has its principal place of business in New York City. The defendant is a corporation existing under the laws of the state of West Virginia and having its established place of business in the city of Buffalo, in the state of New York. On April 25, 1907, Earl L. Brownson, of Allston, Mass., filed an application in the United States Patent Office for a patent for an improvement in strip-serving apparatus. Thereafter Brownson assigned his interest therein to the plaintiff, and a patent was issued, No. 913,614, on February 23, 1909. This suit is brought under the patent laws for an infringement of that patent. The court below has entered a decree adjudging the three claims in suit, claims 6, 7, and 8, invalid for lack of invention, and has dismissed

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the bill. The defendant is a user of the tape-moistening machines which are alleged to infringe the patent in suit.

The defense is controlled by and conducted at the expense of the Lang & Gros Manufacturing Company, Incorporated, which manufactured and sold these machines to the Larkin Company.

Emery, Booth, Janney & Varney, of New York City (Frederick L. Emery and Lucius E. Varney, both of New York City, of counsel), for appellant.

Harry L. Duncan, of New York City, for appellee.

Before COXE and ROGERS, Circuit Judges, and AUGUSTUS N. HAND, District Judge.

ROGERS, Circuit Judge (after stating the facts as above). This suit is brought for an alleged infringement of tape-moistening machines, sometimes called binding machines, and sometimes gummed tape machines. The plaintiff claims to have been a pioneer in building up during the past several years a new industry in the use of gummed tape as a substitute for string, cord, sealing wax, glue, and the like for sealing packages in the retail, wholesale, and manufactured trades; and at the present time shipments of small merchandise, whether by freight or express, are almost wholly in fiber cartons, sealed with these strips of gummed paper.

We are informed that the earlier art was restricted to the sealing of small packages, such as those sold over the counters of retail stores; and for such packages a small strip of one inch or an inch and a quarter tape was used. A very slight contact with the moistener was all that was needed in order to moisten sufficiently the thin and narrow film of glue which these tapes carried. While the tapes were narrow, light, and flexible, and while the packages to be sealed were small and light, it was not a matter of consequence if the operators, in drawing out the tape, failed to keep it perfectly true and in uniform contact with the moistener. So long as that condition continued uniform, thorough moistening does not seem to have been a vital or an essential factor. But it was not long before the advantages incident to the use of this method of sealing packages over other methods suggested the application of it to the sealing of larger and heavier packages in the wholesale and jobbing houses. This use, however, made it necessary to employ wider and heavier paper strips, more heavily gummed, and therefore more difficult to handle, moisten, and apply.

Economy in the use of these gummed paper strips as a substitute for other means of sealing depended upon the ability to apply rapidly and conveniently the tape to the package. It also depended upon obtaining a thorough, uniform, and effective moistening of the tapes. The necessity of using wider tapes made necessary heavier paper and heavier glue. The matter of the proper presentation of the end of the tape for seizure by the operator, preliminary to drawing out and moistening the tape and applying the same to the package, was also important.

The appellant's counsel inform us that the difficulty was to combine, in one and the same machine, two such opposite and apparently conflicting ideas as fixed mechanical control of the tape during such portion of its length as is necessary to insure proper and reliably uniform moistening, while at the same time leaving its end presented for convenient seizure, to be drawn from the machine in any necessary direction, at any desired speed, and with a large measure of abandon or carelessness, without danger of impairing the moistener or of breaking the strip. To this end they declare that there are four absolute requisites for the moistening and for the leading end of the tape:

"First, there must be fixed or unvariable mechanical control of the tape to maintain it at all times in its true service path, and such mechanical control must be organized to produce during the draft an effective pressure for moistening; second, the tape end must be freely accessible for immediate seizure by the operator; third, the tape end must not touch any part of the machine, either while at rest or while being drawn out, since, being wet, it would either stick to the machine, or its gummed surface would be rubbed off; fourth, the tape end must be of sufficient length for ready seizure, yet must not be so long that, having become dried, as where permitted to stand for several minutes in disuse, it cannot be remoistened before the strip is again drawn out for use."

And they tell us that the patent in suit solved for the first time the organization of a machine wherein these several last-named requisites were realized.

The claims in suit are 6, 7, and 8. Claim 6 reads as follows:

"A strip-serving device comprising, in combination a support for the paper strip, a strip moistener in juxtaposition thereto, a strip presser above and opposed to said moistener for holding said strip without deflection, in the true service path, thereby to eliminate waste or loss of movement and strip when serving the latter, and a fixed strip-severing device to act upon the strip and offset from the service path of the strip, thereby to require deflection of the strip for severing."

Claim 7 reads as follows:

"A strip-serving device comprising, in combination, a paper strip support, a strip moistener in juxtaposition thereto, means above said moistener to press said strip into effective contact with said moistener, thereby to eliminate waste or loss of movement and strip when serving the latter and a fixed strip-severing device to act upon the strip and offset from the service path of the strip, thereby to require deflection of the strip for severing."

Claim 8 reads as follows:

"A strip-serving device comprising, in combination, a paper strip support, a strip moistener in juxtaposition thereto, a presser above said moistener to maintain said strip during serving in effective contact with said moistener, thereby to eliminate waste or loss of movement and strip when serving the latter, and a fixed strip-severing device constructed and arranged relative to the service path of the strip to compel upward deflection of the strip for severing."

The defenses are anticipation, want of novelty, prior use, and noninfringement. The answer sets up some 21 prior patents to show that the patentee, Brownson, was not the first, original, and sole in-

ventor of any material or substantial part of the thing patented. We only find it necessary to refer to one or two of the prior patents.

Prior to the issuance of the patent in suit a patent had been granted by the United States Patent Office to one Piper, being patent No. 700,816. The device in that patent consists of a holder for a roll of gummed paper tape in combination with a roller for moistening the paper and a knife for cutting it off after it has been pulled out to the desired length. The combination is completed by a mechanism for removing the paper from the top of the roller, so that it will not stick to it. This it accomplished by having the paper before it reached the roller pass over a swinging guide which holds the free end away from the roller. The idea of this patent is that of a continuous roll of paper or tape, which was wet by being passed over a wet roller, and which was cut in various lengths as needed by a knife adjacent to the roller. The tape was then used for binding packages. The patent was the basis for a new method of making up parcels and it developed a new industry. The validity of the patent was sustained in National Binding Machine Co. v. James D. McLaurin Co. (C. C.) 186 Fed. 992 (1911), and in National Binding Machine Co. v. Eisler (D. C.) 197 Fed. 175 (1912).

On April 19, 1904, the United States Patent Office issued a patent, No. 757,565, to George Norwood, of Winthrop, Mass., assignor by mesne assignments to himself and John S. Richardson. The patent was for an improvement in strip-delivering apparatus. This patent now belongs to the complainant, and was granted about five years prior to the patent in suit. The Norwood patent, as the District Judge has pointed out, is an improvement on the Piper patent, and introduced as an additional element in the combination a strip lifter or guide, made of coiled wire or tubing, which served to guide the tape as it was pulled from the roller, and to raise it to keep the end from sticking to the moistener when the apparatus was not in use. In his specification Norwood stated that the invention had for its object "the production of an improved apparatus by which to deliver a gummed strip in any desired length to be used for wrapping bundles, the strip being used by merchants instead of string or india rubber bands."

The complainant now claims that the Norwood machine was not entirely satisfactory. His objection to it is that when the moistener in the machine was new it gave out a good deal of water, but after use it became water-logged and permeated with gum, and it did not give thereafter as much moisture as was desired, so that, when a tape apparently moistened at the time was applied to a corrugated fiber case, it would, as soon as it became dry, peel or lift. This difficulty arose from the fact that the moistener of the machine was stationary. Then an attempt to use a revolving moistener on the machine was made, and this was found less satisfactory than the stationary one, as it supplied too much water; the tape being saturated with the water, so that the tape, when pulled down over the box, would come right up again. Then a rotary or duplex moistener was tried. It was called duplex, because it would rotate and could be also made stationary by

lifting out of the sockets and putting it down in front of the water pan. The testimony shows that this duplex moistener worked better than the former ones, but that the machine still did not work satisfactorily. It also shows that in using the machine, unless an operator was very particular to pull the tape out slowly and straight and without twisting the hand, a piece of tape could not properly be moistened.

It is claimed that the Brownson machine of the patent in suit is not a rearrangement of an old machine, to make it work better, but a new machine, which works differently. It is also claimed that Brownson, by introducing presser means above and just forward of the median line of the moistener, so as to cause the tape to lead down from the highest point of the moistener, succeeded in producing a combination of elements whereby the moistening position of the tape was always maintained rigidly, and the short free end of tape which extended beyond the moistening area was projected into space by being held between said presser device and the moistener. Brownson's idea, it is said, differed from Norwood's in maintaining rigidity of confinement of strip over the entire area of contact. Brownson, it is also said, obtained by means of this rigidity and confinement of strip over the entire area of contact a thorough, uniform, and effective moistening grip, and by means of the short flexible end he secured accessibility, freedom from fouling, and opportunity of remoistening the end of strip, if it became dry. It is also claimed that Brownson's presser device, by being located above and just forward of the median line of the moistener, so that the tape would lead slightly downward therefrom, would perform three functions, namely: It would act with the moistener during draft to produce a uniform, constant and effective moistening contact; it would act with the knife after severance to cause the tape to spring away therefrom; and then it would act with the moistener again to maintain the end of the strip projecting freely into space from fouling, and ready for immediate seizure and remoistening, if desired.

Now it may be conceded that the Brownson machine is an improvement upon the Norwood machine. The Norwood machine, while working satisfactorily with a 35-pound tape, did not work satisfactorily with a 60-pound tape, and packages so sealed became unsealed. And it may be conceded, too, that patentable novelty is sometimes found in discovering what is the difficulty with an existing structure and what change in its elements will correct the difficulty. Miehle Printing Press Co. v. Whitlock Co., 223 Fed. 647, 650, 139 C. C. A. 201 (1915). But the question now is whether Brownson, seeing what was wrong with the Norwood machine, and in devising the means he did for the better moistening of the strip and for freeing the strip end after it was moistened and leaving it protruding for seizure, is entitled to say that what he did amounted to invention. In Dunbar v. Meyers, 94 U. S. 187, 197, 24 L. Ed. 34 (1876), the court said:

"Invention or discovery is the requirement which constitutes the foundation of the right to obtain a patent; and it was decided by this court, more than a quarter of a century ago, that unless more ingenuity and skill were required in making or applying the said improvement than are possessed by

an ordinary mechanic acquainted with the business, there is an absence of that degree of skill and ingenuity which constitute the essential elements of every invention. Hotchkiss v. Greenwood, 11 How. 267 [13 L. Ed. 683]."

We do not see that what Brownson did involves that degree of skill and ingenuity which constitutes invention and entitled him to a monopoly. The record shows that machines having the same object in view as that of the complainant were well known long prior to the date of the Brownson patent. Many of them performed all the functions of the Brownson patent in suit, not perhaps with the same certainty and precision, but effectively and satisfactorily. After the Piper and Norwood patents, nothing but mechanical skill was required to produce the changes and improvements which the popularity of the machines demanded. The prior patents, and there are many of them, all accomplished the desired result of sticking the strip to the desired surface, and the art shows a continuous evolution towards improvement, as new situations arose and new use for the tape developed. To make these improvements, after the broad principle had been shown Brownson by the prior patentees, required only the attention of an intelligent mechanic, who knew how to adapt the machine to the new uses.

Decree affirmed.